NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0212n.06

Case No. 13-4103

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 16, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STOLLE MACHINERY COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| RAM PRECISION INDUSTRIES, et al., | ) | |
| | ) | **OPINION** |
| Defendants-Appellees. | ) | |

BEFORE: GIBBONS and STRANCH, Circuit Judges; REEVES, District Judge.[*]

JULIA SMITH GIBBONS, Circuit Judge. Stolle Machinery Company's former employee, Shu An, left the company in late 2002, moved back to China, and in early 2004 started a competitor company, Suzhou SLAC Precision Equipment. Stolle alleges that An stole its trade secrets, including technical drawings, in order to launch his business. Although Stolle became aware starting in 2003 that An was doing business in China and had obtained some drawings, Stolle did not bring suit against An until 2010, when Stolle brought numerous claims against An and SLAC for, *inter alia*, trade secret misappropriation, copyright infringement, deceptive trade practices, and tortious interference with business relationships. Finding that Stolle's trade-secret-misappropriation claims were time-barred, that Stolle had presented no evidence of copyright infringement by SLAC, and that Stolle's other claims were preempted by the Ohio Uniform Trade Secrets Act, the district court granted summary judgment to defendants

---

[*]The Honorable Pamela L. Reeves, United States District Judge for the Eastern District of Tennessee, sitting by designation.

on everything except the claim against An for copyright infringement. Stolle appeals. We affirm the district court's judgment in all respects but one: SLAC was not entitled to summary judgment on Stolle's claim of trade secret misappropriation because there was a genuine issue of material fact about when the statute of limitations began to run against SLAC. On that claim we reverse and remand to the district court for further proceedings.

I.

Stolle Machinery Company manufactures and services machinery used to produce food and beverage cans. The worldwide market for can-making equipment is relatively small and is dominated by only four firms, of which Stolle is the largest. Founded in 1961, Stolle is a Delaware corporation with its headquarters and principal place of business in Centennial, Colorado, and additional facilities in Sidney, Dayton, and Canton, Ohio. Stolle has customers around the globe, including in China.

Shu An, a native of China, came to the United States in early 1990 to study for a graduate degree in engineering at the University of Cincinnati. In late 1992, An began working at Stolle as a project engineer in the feed equipment department; feed equipment involves some of the company's most important and sensitive proprietary information. This information includes trade-secret design drawings as well as non-trade-secret "wear tool drawings." At that time, An signed an employment contract in which he agreed not to use or disclose Stolle's confidential information, including trade secrets, without Stolle's written consent. An later became manager of the feed equipment department, and in 2000, he attained U.S. citizenship. In 2001 and 2002, Stolle management noted that An was exhibiting several performance problems, including technical errors and sleeping on the job, and his supervisor put together a plan to help him improve. At the end of 2002, An asked for leave to go to China to take care of his sick father. In

early 2003, after failing to return to Stolle or contact the company about his absence, An was fired.

In late 2003, Robert Gary, a Stolle sales representative in China, learned from existing and potential customers that An was approaching them and offering to sell them can-making equipment identical to Stolle's at a much cheaper price. On November 14, 2003, Gary sent Greg Butcher, who at the time was the president of Stolle Machinery, the following email, with the subject "Shu An":

> . . . This guy is really screwing things up over here. Three people besides Qiong have said he can sell them the conversion systems and PostOp. "He was the designer of the PostOP and can sell anything for atleast [sic] 40% less than you." I would bet I will hear more next week at the show. Sounds like he has all the drawings. I am having Qiong get his address over here for possibility of legal action. We sure do not want him running aroung [sic] say [sic] he can do it cheaper. People over here will take him up on it. I think you may want to stop it before it gets rolling in this market. . .

Butcher testified in January 2013 that when he received Gary's email in November 2003, he understood Gary to be concerned about a "major breach in security," namely that An "had stolen our technology." Butcher further testified that at the time he received the email, he understood Gary's statement that "[An] has all the drawings" to mean that "Bob's concern was that [An] had more than wear tool drawings."

On December 4, 2003, Butcher sent a letter to Stolle's suppliers alerting them to Stolle's concerns about An's behavior:

> . . . Stolle has learned through reliable sources that Mr. An is using, manufacturing, and selling Stolle post-repair, conversion equipment, tab, and lane die tooling in China. It would be remarkable for Mr. An to have developed his own line of machinery which we have heard is identical to Stolle's machinery in six (6) months since leaving the employment of Stolle without utilizing Stolle's trade secret and confidential information. . . . Stolle views Mr. An's activities as a situation that needs to be carefully scrutinized for any developments that might indicate a potential problem. . . . We have been given examples, by one of our local tooling suppliers, that Mr. An has taken Stolle tooling drawings, and had

removed both the Stolle part number, and company name, in hopes to disguise his criminal actions. . . .

We request for you to require a press serial number, and for all such inquiries to be reviewed by Stolle, prior to your company accepting conversion tooling orders from any Chinese concern. This would prevent your company from knowingly aiding and abetting Mr. Shu An in a criminal act. . . .

In response, An retained counsel in the United States, who sent a letter to Stolle in February 2004 demanding an explanation of "the specifics of Stolle Machinery's position and the basis for said position," suggesting that Stolle was "using defamatory, or at best, very aggressive tactics, to prevent Mr. An from earning a livelihood," and stating that Stolle should "cease these tactics immediately." On March 2, 2004, Stolle's counsel sent a reply to An's counsel, stating that although "Stolle Machinery does not agree with your characterization of communications Stolle had, or is alleged to have had, with various companies regarding your client[,] . . . Stolle does not anticipate having any communication with other companies regarding your client in the future." In his January 2013 deposition, Butcher explained why Stolle did not take further action against An in 2003:

How do you secure drawings from a Chinese nationalist who is hiding in China? I don't know. That was the question I have. If he was an American living in the U.S., I probably would have done something more. That's my point. But I didn't know what to do when a Chinese person stole my drawings potentially. How do I go after him in Jiangsu, wherever he is hiding.

Also in 2004, one of Stolle's suppliers gave the company what appeared to Stolle at the time to be two virtually identical copies of Stolle's wear tool drawings, except that the Stolle label had been replaced with the name of a Chinese company, Suzhou Anchor. Butcher followed up with Stolle's agent in China, a woman named Liu Qiong, who informed him that Suzhou Anchor was An's company.[1] At some point in 2005 and 2006, Butcher asked Liu Qiong to

---

[1] An denied ever creating a company called Suzhou Anchor or presently holding an ownership interest in any company called Suzhou Anchor.

conduct "further investigation on [An's] company to find out what he was claiming in the marketplace." She informed Butcher that An "was going to customers that we interacted with claiming he had taken drawings and that he was the Stolle of China." Butcher contacted the FBI at some point after 2004 because of his concerns that An had committed corporate espionage, but "stepped back from it because [he] didn't have enough evidence." Stolle also did not pursue legal action against An at that time.

Meanwhile, An was conducting business in China. In early 2004, An founded Suzhou SLAC Precision Equipment. According to An, SLAC sold its first conversion press—a used system that SLAC had refurbished—in late 2005. In 2006, SLAC provided a full conversion system—indirectly, by way of a company called Alfons-Haar, according to An—to Simmons Pet Food in the United States. Upon learning of this, Stolle obtained sample can ends produced by the machine at Simmons Pet Food and concluded that they were identical in every material respect to can ends produced by a Stolle machine. Stolle concluded at this point, based on its analysis of the can ends, that An and SLAC "had the capability of a full conversion system" and necessarily had "detailed drawings and drawings that were not publicly given out from [Stolle]."[2] Later, other Stolle employees reviewed pictures of machinery on the publicly-accessible SLAC website and found that it distinctly resembled Stolle machinery. And in February 2007, an employee of another can-making equipment company sent Stolle copies of drawings that were labeled with SLAC's title but that the employee believed were actually Stolle drawings. Even so, Stolle did not then bring suit against An or SLAC.

In late 2009, Kenneth Fultz, Stolle's director of sales, left the company and accepted a job at RAM Precision Industries, a firm that had been one of Stolle's parts suppliers. In

---

[2] According to An, however, the conversion system at Simmons Pet Food in 2006 was a used Stolle press that SLAC had refurbished.

February 2010, Stolle learned from its agent in China that Fultz and An had jointly met with customers in China during the previous month. Stolle became concerned that Fultz was violating his nondisclosure and noncompete agreements. At this point the wheels of this litigation finally began to turn.

On April 22, 2010, Stolle filed suit against RAM Precision Industries, Kenneth Fultz, Shu An, and Suzhou SLAC Precision Equipment. Stolle brought the following claims: (1) copyright infringement, against all defendants; (2) misappropriation of trade secrets, under the Ohio Uniform Trade Secrets Act (OUTSA), against Fultz and RAM;[3] (3) conspiracy to misappropriate trade secrets, under OUTSA, against Shu An and SLAC; (4) breach of employment agreement, against Fultz; (5) breach of nondisclosure and limited use agreement, against RAM; (6) tortious interference with prospective business relations, against all defendants; (7) unfair competition, against all defendants; (8) deceptive trade practices, under the federal Lanham Act and the Ohio Deceptive Trade Practices Act, against all defendants; and (9) conversion, against all defendants. Stolle requested injunctive relief against all defendants.

Stolle settled all of its claims with RAM and Fultz in November 2010. The remaining defendants, An and SLAC, moved to dismiss Stolle's complaint for lack of personal jurisdiction, under Fed. R. Civ. P. 12(b)(2), and for failure to state a claim upon which relief can be granted, under Fed. R. Civ. P. 12(b)(6). The district court concluded that it had personal jurisdiction over An and SLAC, but granted An and SLAC's motion to dismiss with respect to Stolle's claims of unfair competition and conversion.

After discovery, the parties filed cross-motions for summary judgment on the remaining claims. The district court denied Stolle's motion in its entirety and granted summary judgment

---

[3] The district court later construed this—correctly, we think—as a complaint against An and SLAC as well.

to the defendants on all claims except Stolle's copyright infringement claim against An. The district court found that Stolle's trade-secret misappropriation claim was time-barred: no reasonable jury could conclude that the OUTSA four-year statute of limitations had begun to run any later than December 2003, but Stolle did not file suit until April 2010. The district court further concluded that Stolle's claims of conspiracy to misappropriate trade secrets and tortious interference with prospective business relations were preempted by the OUTSA, because proof of those claims would necessarily also establish a claim for misappropriation of trade secrets. The district court ruled that Stolle's federal and state claims for deceptive trade practices failed on the merits. Stolle could not, as a matter of law, show that SLAC had passed off Stolle's goods as its own, because while taking tangible goods and reselling them as one's own constitutes illegal "reverse passing off," taking intellectual property and incorporating it into one's own goods does not. Furthermore, Stolle had not presented evidence of any literally false statement or actual deception. Finally, the district court found that SLAC was entitled to summary judgment on the copyright infringement claim because the allegedly infringing conduct took place before SLAC was founded.

Pursuant to Fed. R. Civ. P. 54(b), Stolle moved the district court to certify partial final judgment and stay the remaining proceedings (namely, the copyright infringement claim against An) pending Stolle's appeal to this court. The district court granted certification on August 20, 2014, and on September 16, 2013, Stolle timely filed its appeal of the district court's partial grant of summary judgment to An and SLAC.[4]

---

[4] At this point, An and SLAC filed a notice of cross appeal of the district court's order overruling in part defendants' motion to dismiss and the district court's order denying summary judgment to An on the copyright infringement claim. This court granted Stolle's motion to dismiss defendants' cross appeal for lack of jurisdiction.

II.

This court reviews *de novo* the district court's grant of summary judgment.  *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 843 (6th Cir. 2013).  Summary judgment is appropriate if the record, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" for the court to deny defendant's motion for summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

III.

Defendants An and SLAC moved the district court to dismiss Stolle's claims on the basis that the court lacked personal jurisdiction over An and SLAC.  The district court concluded that it did have personal jurisdiction over An and SLAC in this case.  Now, in response to Stolle's appeal of the district court's partial grant of summary judgment, defendants reiterate that the district court did not have personal jurisdiction.  We are obliged to consider this argument before proceeding to the merits of Stolle's appeal.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93–94 (1998).  Where, as here, the district court ruled on the defendant's jurisdictional motion to dismiss solely on the basis of written submissions without conducting an evidentiary hearing, the plaintiff's burden is solely to make a *prima facie* showing that jurisdiction exists.[5]  *See Schneider v. Hardesty*, 669 F.3d 693, 697–99 (6th Cir. 2012).  In

---

[5] As noted in *Schneider*, 669 F.3d at 698–99, even when the court does not conduct an evidentiary hearing, plaintiffs may (although this remains a somewhat unsettled issue) be required to prove jurisdiction by the preponderance of the evidence if the reason for not having an evidentiary hearing is that "no 'real dispute'" exists "as to the facts or to the extent of

assessing whether Stolle has carried that burden, we must conduct the state long-arm and federal constitutional inquiries separately because the Ohio long-arm statute, Ohio Rev. Code § 2307.382, does not extend to the federal constitutional limits of the Due Process Clause. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (citing *Goldstein v. Christiansen*, 638 N.E.2d 541, 545 n. 1 (Ohio 1994) (per curiam)). Furthermore, "[p]ersonal jurisdiction must be analyzed and established over each defendant independently." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

The first question, then, is whether An and SLAC were within the reach of the Ohio long-arm statute. Ohio Rev. Code § 2307.382 provides, in relevant part, as follows:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
>
> (1) Transacting any business in this state; . . .
>
> (3) Causing tortious injury by an act or omission in this state; . . .
>
> (6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state [.]

Stolle has made a *prima facie* showing that An caused tortious injury by an act in Ohio, pursuant to subsection (3), and that An caused tortious injury in Ohio by an act outside Ohio with the purpose and reasonable expectation of injuring persons in Ohio, pursuant to subsection (6)—a provision that courts in this circuit have generally interpreted broadly. *Schneider*, 669 F.3d at 700. As outlined above, Stolle has alleged and can point to facts in the record suggesting that An misappropriated technical and customer information while he was still employed by Stolle in

---

discovery." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). Here, regardless of whether any dispute exists over the extent of discovery, the facts are sufficiently in dispute to warrant application of the lighter *prima-facie*-showing standard. *See Schneider*, 669 F.3d at 698–99.

Ohio and that An used information that he wrongly took from Stolle to found his competitor firm, SLAC, and to solicit customers. In committing these acts outside Ohio (in China), An necessarily would have had the purpose and reasonable expectation of enhancing his own business at the expense of Stolle's business in Ohio. For the same reasons, SLAC also fell within the reach of subsection (6) of the Ohio long-arm statute. Furthermore, Stolle has made a *prima facie* showing that SLAC is also covered by subsection (1) of the long-arm statute, because SLAC had transacted business with RAM Precision Industries, an Ohio firm, and SLAC and An's later business relationship with RAM formed the basis for some of the claims brought by Stolle against An and SLAC.

The second question is whether the exercise of personal jurisdiction over An and SLAC comported with federal due process. Because neither An nor SLAC were "essentially at home in" Ohio, we assess whether the district court had specific jurisdiction over them for this particular controversy. See *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). Our court has distilled a three-part test for specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002) (quoting *S. Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Applying this test, we conclude that the district court's exercise of jurisdiction over An and SLAC comported with due process. Stolle has made a *prima facie* showing that An purposefully availed himself of the privilege of employment in Ohio and that he took drawings and other information from Stolle while he was there. Stolle has also made a *prima facie*

showing that An caused a consequence in Ohio by his subsequent actions in China—founding SLAC, allegedly with the aid of confidential information that he took from Stolle, and soliciting Stolle's customers. Furthermore, Stolle's entire cause of action arises from An's actions while he was in Ohio. And on both of the first two prongs of this jurisdictional analysis, the contacts that An, the agent, had with Ohio can be imputed to SLAC, the principal that has subsequently ratified his conduct in Ohio. *See McFadin v. Gerber*, 587 F.3d 753, 761 (5th Cir. 2009). Finally, "an inference of reasonableness arises where the first two criteria are met and . . . 'only the unusual case will not meet this third criterion.'" *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir. 1991) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988)). Notwithstanding the burden that is placed on An and SLAC if they must litigate in Ohio, Stolle and the State of Ohio have interests in this dispute that are sufficiently great as to make the exercise of jurisdiction over An and SLAC reasonable. *See Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 113–116 (1987). They were and are therefore subject to the jurisdiction of the district court in Ohio.

IV.

Having established jurisdiction, we turn to the merits and first consider whether the district court erred in granting summary judgment to An and SLAC on Stolle's claims for misappropriation of trade secrets. The Ohio Uniform Trade Secrets Act (OUTSA) provides for damages and injunctive relief to a plaintiff whose trade secrets have been misappropriated. Ohio Rev. Code § 1333.61–69. Under OUTSA, "misappropriation" is defined as follows:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
>
> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
>
> (a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 1333.61(B). "Trade secrets" are

information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 1333.61(D). Under the OUTSA statute of limitations, a plaintiff must bring suit "within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *Id.* § 1333.66. "[A] continuing misappropriation constitutes a single claim" for purposes of the limitations provision. *Id.*

This court has previously endorsed the "confidential relationship" approach to the UTSA, under which "the first discovered (or discoverable) misappropriation of a trade secret commences the limitation period, placing the focus . . . on the breach of the relationship between the parties at the time the secret is disclosed." *Amalgamated Indus. Ltd. v. Tressa, Inc.*, 69 F. App'x 255, 261 (6th Cir. 2003) (discussing Kentucky's version of the UTSA). "[T]he discovery rule requires the owner of a trade secret to conduct a timely and reasonable investigation after

learning of possible misappropriation, not to file prematurely." *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007) (emphasis omitted).

Applying this standard, we must conclude that the district court was correct in granting summary judgment to An because Stolle's claim against him was time-barred. Stolle argues that it did not discover and should not reasonably have discovered An's alleged trade secret misappropriation until 2006, when it received can end samples from the machine at Simmons Pet Food. Even viewed in the light most favorable to Stolle, however, Gary's email to Butcher on November 14, 2003, shows that Stolle was aware of the breach of the relationship between the parties at that time: "This guy [An] is really screwing things up over here. Three people besides Qiong have said he can sell them the conversion systems and PostOp. 'He was the designer of the PostOP and can sell anything for atleast [sic] 40% less than you.'" Although Stolle maintains on appeal that it did not know that An had *trade secret* drawings at that time, this assertion is belied by Gary's statement to Butcher that An probably had "*all* the drawings." Moreover, Butcher has testified that he understood Gary's statement to mean that Gary was concerned "that [An] had more than wear tool drawings" and that An "had stolen our technology." Indeed, Stolle's email to its suppliers on December 4, 2003, stated that Stolle found it improbable that An could have "developed his own line of machinery which we have heard is identical to Stolle's machinery in six (6) months since leaving the employment of Stolle without utilizing Stolle's trade secret and confidential information." Butcher himself acknowledged that Stolle would have pursued An more vigorously in December 2003 if An had not been in China. No reasonable jury could find that Stolle knew of the breach of its relationship with An, and thus reasonably should have discovered An's alleged trade secret misappropriation, any later than December 2003—but Stolle did not file suit until 2010.

*Raytheon Co. v. Indigo Sys. Corp.*, 688 F.3d 1311 (Fed. Cir. 2012), upon which Stolle relies heavily, is distinguishable. In that case, Raytheon suspected in 1997 that Indigo, a Raytheon contractor, was "recruiting Raytheon personnel to gain access to Raytheon trade secrets." *Id.* at 1313. The parties reached an agreement in 1997 that satisfied Raytheon's concerns, and the relationship between Raytheon and Indigo ended in 2000. *Id.* Then, in March 2004, Raytheon acquired an Indigo camera, apparently as part of its normal practice to learn about what its competitors were doing. *Id.* Months later, in August, Raytheon finally got around to taking the Indigo camera apart and only at that time discovered evidence of trade secret misappropriation. *Id.* The Federal Circuit concluded that Raytheon had presented sufficient evidence that it had bought the camera without any particular suspicion of trade secret misappropriation—an assertion that was bolstered by the fact that Raytheon waited from March until August to disassemble it. *Id.* at 1317. This was enough to raise a genuine issue of material fact about when the statute of limitations began to run. *Id.* at 1318–19. Here, however, Stolle's initial concerns were never resolved through an agreement, as in *Raytheon*. Stolle simply wrote to An's attorney and unilaterally decided that it would not continue contacting customers about its concerns about An. And Butcher himself acknowledges that the main reason Stolle declined to pursue further its concerns about An in 2003 was his location in China. Further distinguishing this case from *Raytheon*, where Raytheon presented evidence that it purchased the Indigo camera and then took it apart months later as part of a routine business practice, the main reason that Stolle chose to investigate the SLAC machine at Simmons Pet Food in 2006 was because of its continuing concerns about An's actions beginning in 2003.

Although the district court was correct to find that Stolle's trade-secret-misappropriation claim against An was time-barred, we are unable to reach the same conclusion as to SLAC.

Simply put, SLAC did not exist in 2003 when Stolle was put on notice as to the potential trade secret misappropriation by An. The statute of limitations cannot have begun running as to SLAC in 2003 when, according to the evidence in the record, SLAC was not founded until 2004. The district court treated the statute-of-limitations analysis identically as to both An and SLAC, but this was a mistake. We are unable to identify evidence in the record that conclusively demonstrates that Stolle should reasonably have discovered SLAC's alleged trade secret misappropriation before late 2006, when it investigated the machine at Simmons Pet Food. Although such evidence may emerge at trial, at this point we hold that a genuine question of material fact exists about when the OUTSA statute of limitations began to run with respect to Stolle's claim against SLAC. We therefore reverse the district court's grant of summary judgment to SLAC on Stolle's claim for trade secret misappropriation and remand for further proceedings.

V.

The district court found that Stolle's state-law claims for conspiracy to misappropriate trade secrets and tortious interference with prospective business relationships were preempted by the OUTSA; the district court therefore granted summary judgment to defendants on these claims without reaching the merits. Stolle challenges these rulings.

The OUTSA incorporates the Uniform Trade Secrets Act's displacement of "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). "Other civil remedies that are not based on misappropriation of a trade secret" are not preempted by the OUTSA. *Id.* § 1333.67(B)(2). The precise scope of the preemption clause has not been interpreted uniformly across UTSA jurisdictions. *See generally* John T. Cross, *UTSA Displacement of Other State Law Claims*, 33 Hamline L. Rev. 445 (2010); Warrington S. Parker, III & Daniel D. Justice, *The Differing*

*Approaches to Preemption under the Uniform Trade Secrets Act*, 49 Tort Trial & Ins. Prac. L.J. 645 (2014). And, unfortunately, "[t]he Ohio Supreme Court has yet to speak to the scope of the OUTSA's preemption clause." *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 919 (N.D. Ohio 2011).

Uncertainty about the scope of the UTSA's preemption clause runs along at least two axes. First, courts are divided about whether the UTSA preemption clause should be read literally, to displace "only civil non-contract remedies for misappropriation of a *trade secret*," or whether it should be interpreted more broadly so as "to abolish all other causes of action for theft, misuse, or misappropriation of any confidential or secret information." Parker & Justice, *supra*, at 648 (emphasis in original); see also *Office Depot*, 821 F. Supp. 2d at 918 (stating that "courts have disagreed regarding whether claims based on misappropriation of information not rising to the level of 'trade secret' status are nevertheless preempted under the UTSA," and citing federal district court cases from Arizona and Virginia to illustrate this point). The majority of UTSA jurisdictions have taken the latter approach, Parker & Justice, *supra*, at 648, and courts applying the OUTSA generally seem to have subscribed to the (broader) majority rule. *Office Depot*, 821 F. Supp. 2d at 918–19 (citing *Allied Erecting and Dismantling Co. v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d 702, 720 (N.D. Ohio 2009)); *Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*, 936 N.E.2d 122, 130 (Ohio Ct. App. 2010) ("This language was intended to prevent inconsistent theories of relief for the same underlying harm and has been interpreted to bar claims that are based solely on allegations of misappropriation of trade secrets or other confidential information.").

Having established that the OUTSA should be understood to preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way

on misappropriation of trade secrets, we are still left with the second axis of interpretive uncertainty: how to analyze whether a cause of action is based on the misappropriation of trade secrets. Parker & Justice, *supra*, at 655. Here, courts have two primary approaches: (1) compare the elements of the state law claim to the elements of a UTSA claim, or (2) determine whether the state law claim arises out of the same core of facts that would underlie a potential UTSA claim. Cross, *supra*, at 456–60. Courts interpreting the OUTSA seem generally to have followed something closer to the second approach, focusing on commonality of the operative facts. "The test to determine whether a state law claim is displaced by OUTSA is to determine whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008) (quoting *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999)). Where the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, "the portion of the claim supported by an independent factual basis survives preemption." *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012) (quoting *Office Depot*, 821 F. Supp. 2d at 921).

Applying this standard, we conclude that the district court was correct to find that Stolle's claim for tortious interference with business relationships was preempted by OUTSA. To recover on a claim for tortious interference with business relationships, a plaintiff must show (1) the existence of a business relationship, (2) the wrongdoer's knowledge of the relationship, (3) the wrongdoer's intentional and material interference with the business relationship, (4) lack of justification, and (5) damages. *Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012). Stolle alleged in its complaint that defendants

"solicit[ed] . . . customers and represent[ed] themselves as having knowledge and technical know-how to use in providing a directly competing product to Stolle at a reduced price."[6] As the district court correctly noted, the core of Stolle's tortious interference claim—and the only part of it that is truly in dispute—is that defendants' solicitation of customers lacked justification, and the question of whether defendants lacked justification hinges on whether they were using "wrongful means." In turn, whether the defendants were using wrongful means depends on whether they had used Stolle's customer lists and technical information without Stolle's consent[7]—and this is, under OUTSA, squarely a matter of whether trade secrets have been misappropriated. *See* Ohio Rev. Code § 1333.67. Stolle's claim for tortious interference with business relationships therefore essentially restates the operative facts of its claim for trade secret misappropriation under OUTSA, and it is preempted.

The district court was also correct to find that Stolle's claim for conspiracy to misappropriate trade secrets is preempted by the OUTSA. Even though proof of conspiracy requires proving additional facts—a malicious combination of two or more persons causing

---

[6] In its memorandum in opposition to defendants' motion for summary judgment, Stolle also contended, for the first time, that An and SLAC had tortiously interfered with Stolle's business relationships by arranging to have the Chinese customs service block the delivery of a Stolle machine to a Stolle customer in China. In a deposition, An acknowledged that SLAC had done so but said that it was because Stolle was shipping the machine in violation of a patent held by SLAC in China. The district court declined to address Stolle's claim because Stolle had not previously raised it and had "done nothing to flesh this out as a separate basis for a tortious interference claim." On appeal, Stolle throws this claim into the mix again, although this time around Stolle spins it as a claim for tortious interference with existing contractual relations. We decline to consider this claim that was never pled, was never fleshed out below, and was raised for the first time in opposition to defendants' motion for summary judgment. *See Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 789 (6th Cir. 2005). Even if Stolle's claim for tortious interference with contractual relations were colorable, that "claim is not before us." *Id.*

[7] Stolle all but acknowledges as much in its reply brief, where it emphasizes that defendants' actions lacked justification because they were based on defendants' misappropriation of trade secrets.

injury, *see Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)—beyond the underlying unlawful act, the conspiracy claim is dependent on proof of the underlying act—here, misappropriation of trade secrets. Stolle's conspiracy claim similarly restates the operative facts that would establish Stolle's claim for misappropriation of trade secrets. Stolle argues on appeal, however, that its "conspiracy claim is not limited to Defendants' misappropriation of trade secrets, but includes Defendants' intent to interfere with Stolle's existing customer relations with the aid of RAM and Fultz." Not only is this portrayal plainly inconsistent with Stolle's complaint, which frames Stolle's conspiracy claim only as a claim for conspiracy to misappropriate trade secrets, but it also presents a conspiracy claim predicated on the underlying wrongful act of tortious interference with Stolle's business relations that would itself be preempted, per the discussion above.

VI.

Stolle also challenges the district court's grant of summary judgment to defendants on its claims brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Ohio Deceptive Trade Practices Act (DTPA), Ohio Rev. Code § 4165.02; and Ohio common law. In its complaint Stolle raised two arguments: (1) "Defendants are passing off Stolle's technical know-how, design drawings, trade secrets and proprietary information as their own," and (2) "Defendants have falsely represented that the products and services they are manufacturing and/or selling—all of which incorporate Stolle's misappropriated trade secrets—originate with the Defendants," and "that the products they are manufacturing and/or selling have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have."

Stolle's claims under the DTPA and Ohio common law are coextensive with Stolle's Lanham Act claim and are analyzed the same way. *See, e.g.*, *Groeneveld Trans. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 520 (6th Cir. 2013) (citing *Daddy's Junky Music Stores,*

*Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 288 (6th Cir. 1997)). Section 43(a) of the

Lanham Act provides as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Under the Lanham Act, "passing off . . . occurs when a producer misrepresents his own goods or services as someone else's"; "reverse passing off" occurs when a "producer misrepresents someone else's goods or services as his own." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003).

Stolle's first claim is for reverse passing off: Stolle alleges that An and SLAC were incorporating Stolle's trade secrets into their own machine and passing it off as their own. But this reverse passing off claim fails as a matter of law under *Dastar*, which held that the concept of "origin of goods" in the Lanham Act protects only "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." 539 U.S. at 37. Thus, "[t]aking tangible goods and reselling them as your own constitutes a Lanham Act violation; taking the intellectual property contained in those goods and incorporating it into your own goods does not." *Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting, Inc.*, 299 F. App'x 509, 511 (6th Cir. 2008).

In its reply brief, Stolle for the first time makes the argument that in its sale to Simmons Pet Food, SLAC was passing off a refurbished Stolle machine as a new SLAC machine. On its face this would appear to constitute a cognizable Lanham Act violation. And Stolle's argument on this point appears to have some factual support: defendants say that the machine sold to Simmons was a refurbished Stolle machine, while Stolle has introduced evidence that the machine at Simmons bore a SLAC nameplate. But the rule is well established that "[a]n argument raised for the first time in a reply brief will not be considered by this Court." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986)). Moreover, "application of this rule is particularly appropriate when the issue raised for the first time in reply is based largely on the facts and circumstances of the case," as it is here. *Wright*, 794 F.3d at 1156. We therefore affirm the district court's dismissal of Stolle's reverse passing off claim.

Stolle's second claim, for false advertising, arises out of a single fact upon which the parties generally agree: SLAC's website contained a photograph of a piece of Stolle machinery that had been refurbished by SLAC. Stolle argues that the display of this photograph constituted a false statement because, they allege, SLAC was depicting Stolle equipment bearing Stolle's trademark as SLAC's own equipment. In order to obtain damages on a false advertising claim under the Lanham Act, plaintiffs must be able to point to a literally false statement or, by showing "proof of actual deception," demonstrate that the statement was misleading. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999). For injunctive relief, the plaintiff must show that the purportedly misleading representations "have a tendency to deceive customers." *Id.* at 618. But Stolle has not introduced any additional evidence to demonstrate that defendants were doing anything other

than what they say they were doing—posting the picture on their website to illustrate that they were in the business of refurbishing Stolle machines. Without further context, we see no evidence that defendants made a literally false statement. And Stolle has not introduced any "proof of actual deception," which requires "evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product" or evidence that the picture would tend to mislead consumers. *Id.* We therefore affirm the district court's judgment as to this claim as well.

VII.

Finally, Stolle challenges the district court's grant of summary judgment to SLAC on Stolle's claim that SLAC committed copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, by copying two of Stolle's tooling drawings (the drawings labeled "Suzhou Anchor" to which Stolle was alerted in 2004 by one of its suppliers). "'To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it.'" *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (6th Cir. 2004) (quoting *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003)). "Where there is no direct evidence of copying, a plaintiff may establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Id.* (internal alterations and quotation marks omitted).

Although Stolle has presented evidence suggesting that An copied the tooling drawings, Stolle has not presented evidence that SLAC copied the tooling drawings. An, the alleged point of access to Stolle's drawings, left Stolle by the end of 2002, and the allegedly infringing drawings are labeled February 13, 2003. But SLAC was not formed until 2004, and Stolle has provided no evidence of any copying after the time SLAC was formed. The use of copies to

manufacture a product does not, by itself, constitute copyright infringement: to hold otherwise would transform a copyright into a patent. *See Robert R. Jones Associates, Inc. v. Nino Homes*, 858 F.2d 274, 280–81 (6th Cir. 1988). Furthermore, the allegedly infringing drawings are labeled "Suzhou Anchor," but Stolle has provided no evidence of any connection between Suzhou Anchor and SLAC outside of An's alleged ownership in both companies. The district court therefore was correct to grant summary judgment to SLAC on Stolle's copyright infringement claim.

## VIII.

For the reasons explained above, we affirm the judgment of the district court in all respects except its grant of summary judgment to SLAC on Stolle's claim for misappropriation of trade secrets. Because a genuine issue of material fact exists as to when the OUTSA statute of limitations began to run with respect to SLAC, we reverse the judgment of the district court on that claim only and remand it for further proceedings.